**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| JEFFREY SIEGEL, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| ARDELYX, INC., MIKE RAAB, and JUSTIN RENZ, | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Plaintiff Jeffrey Siegel ("Plaintiff") makes the following allegations, individually and on behalf of all other similarly situated, by and through Plaintiff's counsel, upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which included, among other things, review and analysis of: (i) regulatory filings made by Ardelyx, Inc. ("Ardelyx" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by and disseminated by the Company; and (iii) analyst reports, media reports, and other publicly disclosed reports and information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. Plaintiff brings this federal securities class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased Ardelyx securities between August 6, 2020 and July 19, 2021, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

2. Ardelyx is a specialized biopharmaceutical company focused on developing first-in-class medicine to improve treatment for people with cardiorenal disease. This includes patients with chronic kidney disease ("CKD") on dialysis suffering from elevated serum phosphorus, or hyperphosphatemia; and CKD patients and/or heart failure patients with elevated serum potassium, or hyperkalemia.

3. In June 2020, Defendants submitted a New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA") for Ardelyx's lead product candidate, tenapanor, a supposedly first-in-class medicine for the control of serum phosphorus in adult patients with CKD on dialysis. According

to Ardelyx, tenapanor has "a unique mechanism of action and acts locally in the gut to inhibit the sodium hydrogen exchanger 3, or NHE3," resulting in the "tightening of the epithelial cell junctions, thereby significantly reducing paracellular uptake of phosphate, the primary pathway of phosphate absorption." If approved, tenapanor "would be the first therapy for phosphate management that blocks phosphorus absorption at the primary pathway of uptake[,]" and "could greatly improve patient adherence and compliance with one single pill dosed twice daily in contrast to current therapies where typically multiple pills are taken before every meal." Thus, tenapanor (and its promise) was widely touted by Defendants and, accordingly, extremely important to the valuation (and future success) of Ardelyx securities.

4. The FDA accepted Ardelyx's NDA in September 2020 and set a Prescription Drug User Fee Act ("PDUFA") date of April 29, 2021.

5. The Company repeatedly lauded this development, highlighting the FDA's acceptance and review of the NDA, supported by so-called "successful" Phase 3 studies, in each subsequently filed quarterly report and in the Company's 2020 annual report. Even when the FDA requested that the Company provide additional information related to Ardelyx's clinical data, which caused the PDUFA date to slip by three months, Defendants continued to hype Ardelyx's "positive" clinical trial results, which, according to them, showed "improvements" over current treatments, supported tenapanor's "clinical safety and efficacy," and reinforced its "potential" as a "transformative" treatment. At no point did Defendants state (much less suggest) that there may be fatal issues with the drug, its clinical trial data, or both. Rather, Defendants simply claimed that the FDA's request was merely because they needed help to "better understand the clinical data in light of tenapanor's novel mechanism of action as compared to approved therapies."

6. Defendants' rosy narrative, however, came to a halt after the market closed on July 19, 2021. At that time, Ardelyx announced that it had received a letter from the FDA, dated July 13, 2021,

that said the administration had found deficiencies that precluded discussion around the would-be labeling and post-marketing requirements for tenapanor. Critically, the FDA said it *detected issues with both the size and clinical relevance* of the drug's treatment effect.

7. Immediately, analysts cut their price targets and downgraded the Company's rating. Piper Sandler, for example, rated Ardelyx neutral (down from a buy-equivalent rating) and wrote, "we struggle to see a path forward for Tenapanor." Raymond James, another analyst, reset the Company's price target to $4.00 from $14.00 per share.

8. The Company's share price likewise plummeted, falling $5.69 per share, or nearly 74%, in a single day, to close at $2.01 per share on July 20, 2021, before falling another 4.2% by market close on July 21, 2021.

9. Throughout the Class Period, Defendants made materially false and misleading statements regarding tenapanor and the likelihood that it would be approved by the FDA. Defendants possessed, were in control over, and, as a result, knew (or had reason to know) that the data submitted to support the NDA was insufficient in that it showed a lack of clinical relevance of the drug's treatment effect, making it foreseeably likely (if not certain) that the FDA would not approve the drug.

10. This lawsuit seeks to recover damages sustained as a result of Defendants' wrongdoing.

**JURISDICTION AND VENUE**

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13. The Court has jurisdiction over each of the Defendants named herein because each is an individual or a corporation who has sufficient minimum contracts with this District so as to render the

exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as the Company's headquarters are located within this District.

15. In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16. Plaintiff, as set forth in the attached Certification, acquired Ardelyx securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17. Defendant Ardelyx is a specialized biopharmaceutical company, incorporated under the law of the state of Delaware. Ardelyx is co-located in Fremont, California, and Waltham, Massachusetts. Its Fremont headquarters is at 34175 Ardenwood Boulevard, Fremont, California 94555, and its common stock is listed on the NASDAQ under the ticker symbol "ARDX."

18. Defendant Mike Raab ("Raab") was, throughout the Class Period and at all relevant times, President and Chief Executive Officer of the Company, positions he held since March 2009. Defendant Raab also serves as a director on Ardelyx's Board of Directors (the "Board").

19. Defendant Justin Renz ("Renz") was, throughout the Class Period and at all relevant times, Chief Financial Officer of the Company, a position he held since June 2020.

20. Collectively, Defendants Raab and Renz are referred to herein as the "Individual Defendants."

21. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other material provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their position with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

22. Ardelyx is a biotechnology company focused on the development of therapies for cardiorenal disorder. Though Ardelyx's lead product candidate, tenapanor, has been approved by the FDA as a treatment for irritable bowel syndrome associated constipation, the Company has not commercialized it in the U.S. nor generated any revenue from its sale. Rather, Ardelyx has focused on advancing another indication for the drug, namely for helping to control serum phosphorus in adult CKD patients on dialysis.

23. In fact, Ardelyx presented tenapanor to the FDA as a new treatment to manage hyperphosphamtemia in CKD patients undergoing dialysis treatment based on a Phase 3 program for the control of serum phosphorus in CKD patients on dialysis. In December 2019, the Company reported (purportedly) statistically significant topline efficacy results from its second monotherapy Phase 3 clinical

trial, the PHREEDOM trial, which had followed a "successful" monotherapy Phase 3 clinical trial completed in 2017 that (again, purportedly) achieved statistical significance for the primary endpoint.[1]

24.  Consequently, obtaining regulatory approvals for tenapanor for the control of serum phosphorus in adult CKD patients on dialysis was critical.

**Materially False and Misleading Statements Issued During the Class Period**

25.  The Class Period begins on August 6, 2020, when Ardelyx issued a press release announcing that it submitted an NDA to the FDA for the review of tenapanor as a first-in-class therapy to control serum phosphorus in adult patients with CKD on dialysis. According to the press release, the filing was supported by three *successful* Phase 3 studies demonstrating tenapanor's ability to *reduce* phosphate levels. In addition, the release noted that "additional *positive data* from the ongoing NORMALIZE Phase 4 study" showed a "58% *improvement* over current standard of care" (emphases added).

26.  Also on August 6, 2020, Ardelyx filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2020 (the "2Q20 10-Q"), further touting the apparent benefits of tenapanor, stating, in relevant part:

> In June 2020, we announced *positive* results from a planned interim data analysis from our ongoing NORMALIZE Phase 4 study evaluating tenapanor, as monotherapy or in combination with sevelamer, to achieve serum phosphorus levels in the normal range (2.5 – 4.5 mg/dL) in patients with CKD on dialysis. The NORMALIZE extension study allowed patients from our PHREEDOM study to continue therapy with tenapanor and enabled those patients in the PHREEDOM safety control arm receiving sevelamer carbonate to transition to tenapanor. ***The data from the planned interim analysis demonstrated that the foundational use of tenapanor as monotherapy or in combination with sevelamer carbonate produces a significant phosphorus-lowering effect*** with a mean serum

---

[1] PHREEDOM was a one-year study with a 26-week *open-label* treatment period and a 12-week double-blind, placebo-controlled randomized withdrawal period followed by a 14-week *open-label* safety extension period. An active safety control group, for safety analysis only, received sevelamer, *open-label*, for the entire 52-week study period. Patients completing the PHREEDOM trial from both the tenapanor arm and the sevelamer active safety control arm had the option to participate in NORMALIZE, an ongoing *open-label* 18-month extension study.

phosphorous reduction of 2.33 mg/dL, from a mean baseline phosphorus of 7.27 mg/dL at the beginning of the PHREEDOM trial to a mean of 4.94 mg/dL at the time of this analysis. Of the 171 patients in this interim analysis who completed up to 9 months of treatment in this extension study, up to 47.4% achieved a normal serum phosphorus level, and of those, the majority were on tenapanor alone or tenapanor with low dose sevelamer of ≤3 sevelamer tablets per day. These data represent a 58% *improvement* in the rate of patients who achieve a normal serum phosphorus level, as compared to current treatment practice data as reported in the April 2020 Dialysis Outcomes Practice Patterns Study ("DOPPS") Practice Monitor.

* * *

Tenapanor, if approved, would be the first therapy for phosphate management that blocks phosphorus absorption at the primary pathway of uptake. It is not a phosphate binder. *Tenapanor is a novel, potent, small molecule, that has been shown in the phase 3 studies to treat hyperphosphatemia* as monotherapy and as a dual mechanism approach. Additionally, as such we believe tenapanor could greatly improve patient adherence and compliance with one single pill dosed twice daily in contrast to current therapies where typically multiple pills are taken before every meal.

(Emphases added.)

27. On November 5, 2020, Ardelyx filed with the SEC on Form 10-Q its third quarter 2020 financial results, substantially repeating the same claims made in the Company's 2Q20 10-Q. Defendants also issued a press release that emphasized certain "business highlights," including that the FDA accepted the NDA submitted by Defendants for tenapanor to control serum phosphorus in adult patients with CKD on dialysis. Defendants, again, claimed that the filing was supported by three *successful* Phase 3 studies *demonstrating tenapanor's ability to reduce* phosphate levels, with Defendant Raab, specifically, touting "clinical data presented at ASN Kidney Week 2020[, which] *support[s] the clinical safety and efficacy of tenapanor and reinforce[s] its potential* to transform the treatment landscape for patients" (emphasis added).

28. On March 8, 2021, Ardelyx filed with the SEC its annual report on Form 10-K, reporting its fourth quarter and full year 2020 financial results, which touted the Company's ability to monetize tenapanor upon FDA approval. For example, it stated:

**Tenapanor: A New Approach for The Control of Serum Phosphorus in CKD Patients on Dialysis**

Our portfolio is led by the development of tenapanor, a first-in-class medicine for the control of serum phosphorus in adult patients with CKD on dialysis. Tenapanor for the control of serum phosphorus has a unique mechanism of action and acts locally in the gut to inhibit the sodium hydrogen exchanger 3 ("NHE3"). This results in the tightening of the epithelial cell junctions, thereby significantly reducing paracellular uptake of phosphate, the primary pathway of phosphate absorption. On September 15, 2020 we announced that the FDA accepted the filing of our NDA for tenapanor for the control of serum phosphorus in adult patients with CKD on dialysis. The acceptance of our NDA represents the next critical step toward *bringing to market* a completely new approach to the management of hyperphosphatemia. The FDA has set a PDUFA date of April 29, 2021. *We continue to advance commercial preparations for the launch of tenapanor for this indication.* The NDA is supported by three *successful* Phase 3 trials involving over 1,000 patients that evaluated the use of tenapanor for the control of serum phosphorus in CKD patients on dialysis, with two trials evaluating tenapanor as monotherapy and one trial evaluating tenapanor as part of a dual mechanism approach with phosphate binders.

* * *

In December 2019, we reported *statistically significant* topline efficacy results from our second monotherapy Phase 3 clinical trial, the PHREEDOM trial, which evaluated tenapanor for the control of serum phosphorus in CKD patients on dialysis. The PHREEDOM trial followed a *successful* monotherapy Phase 3 clinical trial completed in 2017, the BLOCK trial, which achieved *statistical significance* for the primary endpoint. The only adverse event reported in these Phase 3 trials in greater than 5% of patients was diarrhea, with an incidence rate of 52% in the PHREEDOM trial and 39% in the BLOCK trial, with most incidences in each trial being mild to moderate in nature. PHREEDOM is a one-year study with a 26-week *open-label* treatment period and a 12-week double-blind, placebo-controlled randomized withdrawal period followed by a 14-week *open-label* safety extension period. An active safety control group, for safety analysis only, received sevelamer, open-label, for the entire 52-week study period. Patients completing the PHREEDOM trial from both the tenapanor arm and the sevelamer active safety control arm had the option to participate in NORMALIZE, an ongoing *open-label* 18-month extension study.

In June 2020, we announced *positive* results from a planned analysis from our ongoing NORMALIZE extension study evaluating tenapanor, as monotherapy or in combination with sevelamer, to achieve serum phosphorus levels in the normal range (2.5 – 4.5 mg/dL) in patients with CKD on dialysis. The NORMALIZE extension study allowed patients from our PHREEDOM study to continue therapy with tenapanor and enabled those patients in the PHREEDOM safety control arm receiving sevelamer carbonate to transition to tenapanor. The data from the planned interim analysis demonstrated that the foundational use of tenapanor as monotherapy or in combination with sevelamer carbonate produces a significant phosphorus-lowering effect with a mean serum phosphorous reduction of 2.33

mg/dL, from a mean baseline phosphorus of 7.27 mg/dL at the beginning of the PHREEDOM trial to a mean of 4.94 mg/dL at the time of this analysis.

(Emphases added.)

29. Also on March 8, 2021, Ardelyx issued a press release within which Defendant Raab stated: "[t]he stage is set for an exciting year for Ardelyx in 2021," since "*we are well positioned and well prepared to commercialize* tenapanor upon potential FDA approval of the first and only phosphate absorption inhibitor for the control of serum phosphorus" (emphasis added).

30. Then, on April 29, 2021, Ardelyx issued a press release announcing the need to provide additional analyses of its clinical data to the FDA in connection with the FDA's ongoing review of the Company's NDA for tenapanor. According to the Company, the FDA requested this information to help it "better understand the clinical data in light of tenapanor's novel mechanism of action as compared to approved therapies." Since this information constituted a "major amendment to the NDA," the PDUFA date was extended three months to July 29, 2021.

31. Defendant Raab offered an optimistic take on the FDA's request in a May 6, 2021 press release announcing the Company's first quarter 2021 financial results, stating, in relevant part:

> We continue to prepare for the potential approval and launch of tenapanor following the recent extension of our PDUFA date to July. *We remain confident in the comprehensive data included in our New Drug Application* and believe tenapanor represents and attractive alternative to currently available therapies to control serum phosphorus in CKD patients on dialysis. To that end, we are committed to working with the FDA through the completion of its review of our NDA and *look forward to the possibility of making a significant impact* in the lives of patients.

(Emphases added.)

32. The statements identified above were materially false and misleading and failed to disclose material facts about tenapanor and the likelihood that it would be approved by the FDA. Defendants possessed, were in control over, and, as a result, knew (or had reason to know) that the data submitted to

support the NDA was insufficient in that it showed a lack of clinical relevance of the drug's treatment effect, making it foreseeably likely (if not certain) that the FDA would not approve the drug.

### The Truth Emerges

33. Defendants' upbeat narrative came to a halt after the markets closed on July 19, 2021, when they announced that Ardelyx received a letter from the FDA *on July 13, 2021*, stating that "the FDA *has identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments*" (emphasis added). Particularly, the FDA noted that "*a key issue is the size of the treatment effect and its clinical relevance*" (emphasis added).

34. On this news, the price of Ardelyx's shares plummeted from their July 19, 2021 closing price of $7.70 per share to a July 20, 2021 close of just $2.01 each. This represents a one-day drop of nearly 74%, or hundreds of millions of dollars in lost market capitalization.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

35. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

36. Plaintiff brings this action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class, consisting of all persons and entities that purchased, or otherwise acquired, Ardelyx securities during the Class Period.

37. Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Ardelyx, members of the Board, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of Ardelyx.

38. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on the NASDAQ, a

national securities exchange. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the Class. Millions of Ardelyx shares were publicly traded during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Ardelyx or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

39. Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws. Further, Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

40. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the members of the Class are:

(a) whether Defendants violated the Exchange Act;

(b) whether Defendants' statements to the investing public during the Class Period omitted and/or misrepresented material facts;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether the price of Ardelyx's securities was artificially inflated; and

   (f)  the extent of damage sustained by Class members and the appropriate measure of damages.

41. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

42. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43. This Count is asserted on behalf of all members of the Class against Ardelyx and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

44. These Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; and (ii) caused Plaintiff and the other members of the Class to purchase Ardelyx securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, each of these Defendants took the actions set forth herein.

45. During the Class Period, Defendants disseminated or approved the false statements specified herein, among others, which they knew, or deliberately disregarded, were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

46. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Ardelyx securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

47. Defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities or interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of Ardelyx, as specified herein.

48. Defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse nonpublic information and engaged in acts, practices, and a course of conduct, as alleged herein, in an effort to assure investors of Ardelyx's value and performance and continued substantial growth, which included the making of, or participation in the making of, false statements of material facts and omitting to state material facts necessary in order to make the statements made about Ardelyx and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Ardelyx securities.

49. As described above, Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or

omissions were done knowingly or recklessly and, for the purpose and effect of concealing the Company's results and growth prospects, thereby artificially inflating the price of its securities. As demonstrated by Defendants' omissions and misstatements of the Company's business strategy, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

50. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Ardelyx securities was artificially inflated. In ignorance of the fact that market prices of Ardelyx's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to, or recklessly disregarded by, Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class acquired Ardelyx securities at artificially high prices and were, or will be, damaged thereby.

51. At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff, the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased, or otherwise acquired, their Ardelyx securities, or if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

52. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities.

54. This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

55. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56. The Individual Defendants acted as controlling persons of Ardelyx within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as alleged herein. By virtue of their high-level positions, agency, ownership, and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to have been misleading prior to, and/or shortly after, these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

57. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or

influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

58. As set forth above, Ardelyx and the Individual Defendants each violated Section 10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions, as alleged in this complaint.

59. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class have suffered damages in connection with their purchases of the Company's securities.

60. This action is filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory and punitive damages in favor of Plaintiff and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C. Awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D. Awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: August 12, 2021

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

***Attorneys for Plaintiff***